Good morning, Florence Weinberg on behalf of Petitioner Santos Lopez-Valiente. May it please the Court. I'd like to first discuss the adverse credibility finding of the Board. A psychiatrist in this case concluded that Ms. Lopez, quote, has a lot of difficulty discussing the details of her traumatic experiences, which is very common in people who have PTSD. As a result, she concluded, it is likely that it will be challenging for her to discuss the trauma during a hearing. That's on page 284. In the immigration judge's decision, he does not discuss Ms. Lopez's PTSD diagnosis in relation to assessing any of the perceived inconsistencies. During the hearing, the officer… But he cites the doctor's report, correct? He cites the doctor's report. He doesn't discuss it with respect to any of the inconsistencies, however. During the hearing, he concluded that he did not see any visible signs from her demeanor that she was having undue difficulty testifying. This Court held in Shrestha that an IJ should not make vague conclusions about demeanor. But this is exactly what the IJ did when he summarily disregarded the psychiatrist's observation without any explanation as to why. In this case, on the record, there's evidence that supports the psychiatrist's observations. During her testimony… Aside from all that… Yes. Supposing we weren't looking at… It's hard to figure out exactly how you're supposed to plug this in or how the IJ was supposed to plug this in, particularly given the fact that presumably everybody who testifies in these hearings is a likely PTSD person, right? I mean, they're all testifying to trauma. That's what they're doing. But even taken on their face, what about the credibility findings? The credibility finding, and I think I'll address the PTSD as it relates to how the inconsistencies then… So there were four inconsistencies that were affirmed by the Board. The first is that Ms. Lopez described the one long-lasting injury during her testimony as in her rib. And in her declaration, she described it as in her back. In Soto Alarte, the court held that an IJ cannot properly base an adverse credibility determinant on inconsistencies if the IJ does not ask the applicant about the discrepancies. Besides which one has ribs in one's back? I mean, the ribs go around, right? The ribs are in the front and the back of the body. So there's no record inconsistency there. So it follows from Soto Alarte, and I think this is vital to this case, that if the IJ does not communicate the perceived inconsistencies… Is this your best one? I think this is what the Board led with, and I think this is the one that's most in dispute, given the government's… Because there was an alternative finding as well, wasn't there? An alternative finding with respect to… I mean, they said there's no nexus. Yes, Your Honor. And I don't think, with respect to nexus, I think it's unnecessary to reach the nexus question in this case. How can you not reach the nexus question in this case? I'm sorry, Your Honor? How could we not reach the nexus question? I think that if the Court is inclined to reverse the adverse credibility finding, it's not clear to what extent the Board relied on that finding in concluding that Ms. Lopez was ineligible for relief. In addition… I thought it was an alternative finding. Not in the Board's decision, Your Honor. The immigration judge says that. The Board does not say that, in assuming arguendo, she's credible. But that had to be what they were saying. It's not clear from the Board that they relied on… that they didn't rely on that adverse credibility finding. But they didn't disturb his alternative finding in any way. I disagree, Your Honor. I think that this is an independent… It did not expressly, at any point, adopt the immigration judge's finding. Well, let's assume we don't agree with you on that. Tell us about your nexus argument. It seems to me you have three disparate events that don't hold together to match up your three theories of protected group. Well, Your Honor, with respect to nexus, we have the three particular social groups that weren't challenged. The motivation of Ms. Lopez's persecutors can be shown by direct… Well, not challenged may not be exactly right, but not evaluated because they really didn't reach it. Instead, they said there's no nexus between the harm she suffered and the particular social group. That's correct, Your Honor. So I don't know that it wasn't challenged. It's just they didn't reach it. They just said, you cannot suggest that even if this is a particular social group, that there's nexus. That's correct, Your Honor. And I guess I'm trying to figure out why they were wrong. Nothing seems like it happened because it was part of a group. Instead, she shows that she was the victim of criminal activity, extortion, or maybe stalking, but the SMS3 gang demands payments from everybody in El Salvador, not just their group. So there was no nexus. So I'd like to actually address that comment in particular. Well, it's not a comment. I'm trying to figure out what your argument is. The Board's comment about general violence. All right. When there's generalized and widespread violence in a country, this should not be used as a factor weighing against the asylum applicant. Well, that's true. Of course that's true. But here you have the social groups that you're trying to define are at least, let's say, not obvious. I mean, they're not. And so there has to be some connective. I mean, there's some reason to think that, for example, the reason these women beat her up was because she was a single woman. There's three alternatives. Well, whatever. Any one of them. Any one of them. Or a woman without male protection or a woman with family in the U.S. Those are the three. And it was anything about the fact that they were apparently MS-13 affiliates and they were hitting her up for money. But what possible connective is there to the asserted social groups? Well, I think that the motivation of her persecutors can be shown by direct or circumstantial evidence. Okay, fine. But she was asked the question, what was the motivation of the four women who attacked her at the nursing institution? And she said it was because she was new and because they ran the place. Yes, Your Honor. Isn't that inconsistent with any social group being the reason? No, Your Honor. The MS-13. Unless the social group was new students at the school, but that isn't the one you're asserting. The one that's articulated. The MS-13 beat, kill, torture their victims for multiple reasons. And one of the central reasons, or just one of the reasons under withholding of removal, can certainly be one that is protected by law. Okay, fine. You still haven't given us a connection. First, there's substantial on the record that she was targeted for being a woman. And I can go through them. This is in the reply brief between page 19 and 26. On page 358, there's information directly on point. In 2010, the year Ms. Lopez fled her home, 580 women were murdered because of their gender. And some of these femicides are directly linked to MARAS. That's in that same page. Women's bodies are found mutilated and raped with little action from law enforcement. On page 465, at least one woman has been killed every day in El Salvador since 2002. El Salvador, by the way, is smaller than the state of New Jersey. An article in the record describes how young women are viewed by society in El Salvador as property and easy targets. Yeah, but it's the evidence in this record that you have to focus on and the nexus that this petitioner placed into the record apart from the generalized country information. Or are you just relying on the generalized country information? When it comes to her gender, yes, Your Honor, the MS-13 didn't tell her they were targeting her because of her gender. I think when a woman is a victim. Particularly because it was a group of women that attacked her, doesn't that make it less likely that it was because of her gender? No, Your Honor, I don't. I think that the country conditions show that women, especially young women, particularly are targets of persecution, especially by the MS-13. And I think we can't look at these different... Well, doesn't the evidence show that the MS-13 and other gangs have demanded small daily payments from everybody? Yes, Your Honor, and that doesn't undermine her claim. Well, it seems to me it makes it such that there seems to be no nexus then. Your Honor, again, general violence doesn't undermine her claim. If anything, it strengthens... Well, in general it doesn't, but the problem with the way you're arguing this is you're giving us broad propositions which are accurate, but you're not tying them into the facts of the case. So you have to tie them into the facts of the case. Okay, so how in this case... Yes. ...does the fact that she was... First of all, your group isn't a woman. I gather... I've always wondered why a woman isn't a social group, but it doesn't... You're not claiming it, and I don't... Nobody... Maybe it's... Nobody does. You're claiming a subgroup of women, essentially. So you have to show us how this ties in to the subgroup of women that you're talking about, specifically in some fashion. I mean, even the evidence that you're... the country evidence that you're citing doesn't differentiate single women who live with... who are unprotected from other people. Well, I think her testimony supports that portion of the particular social group, Your Honor. With regard to what? With respect to her being a single woman, with respect to her being targeted... So the people who attacked her in this school knew that she was a single woman as opposed to a woman? That particular... Do we have any evidence of that? No. No, that particular event, no, Your Honor. But every time she left the house, she was targeted by the MS-13 leader. And she was... Well, that... Could that possibly be persecution? The fact that some guy is basically hitting on her? Your Honor, I think we need to look at these three events, which happened all in quick succession of each other. Do we have any reason to think that she and Huecos and the women in the other town had anything to do with each other? Yes, Your Honor. I think given the network that the MS-13 has, and that's supported in the record, that this and the timing of these events need to be tied all together, and there's circumstantial evidence of that. Do you understand that what we're trying to do is... Judge Berzon has been more than amply good to you in trying to say how do we distinguish Cetino from this case? Cetino, Your Honor, I think... Because Cetino is very straight. It says, desire to avoid harassment or activity by criminals motivated by theft or random violence by gang members. There's no nexus to a protected ground. So Judge Berzon is trying to give you a couple of hints here. She's saying, come on, you've got to distinguish Cetino. You haven't done it yet. Your Honor, I believe Cetino is about general crime, and yes, there is general crime in El Salvador. In this case, there's circumstantial evidence. Given the way these events happened to her, given the quick succession that they happened to her, that she was being targeted for these particular reasons, and I think the evidence supports that. Could I just ask you with regard to your cat claim? As I understand it, in your opening brief, you were relying on the argument that was rejected in Maldonado. That was corrected in the errata. However, there was an alternate ground by the IJ, affirmed by the BIA, with regard to the required acquiescence elements. So if we find that the IJ got it right in finding there was no acquiescence by a public official, then isn't that an alternate ground for affirming the cat claim? Your Honor, with respect to cat, I believe that the errors that we identified in the board's unable and unwilling analysis for purposes of asylum and withholding, and given the substantial overlap of the evidence in the cat context, we would remand for that reason as well. And in addition, there's a relocation reason. We believe that the IJ was clear that she was really, he explains that she really had not presented evidence to show why she could not go to another part of El Salvador. He said he was doing it on all evidence relevant to the possible future torture, and then included, did a list of including but not limited to. Shouldn't we accept that at face value? Your Honor, I think, again, I think that if you read the decision, the immigration's decision, it's clear that the burden is being put on Ms. Lopez. Okay, well, just one last question, even though I said I was going to be tough at that time. What happened here that could possibly be torture? Your Honor, I think that the case, the immigration judge didn't reach that decision. He didn't, persecution and torture were both. All right. Thank you very much. Thank you. Thank you. We'll give you a minute in rebuttal. Thank you. Good morning, Your Honors. Michael Heiss on behalf of the respondent, the Attorney General of the United States. Substantial evidence supports the agency's adverse credibility finding in this case as well as the alternative findings. Some of it is mighty silly, like the ribs. I mean, ribs go around. And the notion that because she was hitting her ribs, she couldn't have had a backache, it just seems ridiculous. She mentioned the backache claim in her, I believe, in her declaration. Right, right. And then she said she was hitting her ribs, and that's supposed to be a contradiction. She also stated in her testimony that she was hit in the face but failed to mention that previously. Fine. She failed to mention it. She didn't say the opposite. There's numerous other inconsistencies here. That's fine. But, I mean, the problem is that some, you know, in some way it seems to me that the way we do credibility findings for the petitioner might be applied to the I.J. as well because the I.J. here said several things that were so silly and flat wrong, and even the BIA recognized that some of them were flat wrong, that I don't know why we should take his credibility finding at all. I would just say this guy had bias or blinders or something, but he just made so many stupid mistakes that we should just forget him. The immigration judge's errors, the board corrected three of them. Were flat out wrong. Left four behind that were not. I understand that, but that's if you go about it that way. Why do we go about it that way? If we're trying to decide whether a petitioner is credible, we say, well, they may have said, you know, if they say three contradictions, they're not credible. Well, this guy, in making his judgment about whether she was credible, made, I would say, at least four flat out mistakes because this ripped things ridiculous. And why do we believe anything he said at that point? This Court's review of adverse credibility findings is, first of all, highly deferential. This Court's decision in Cower made that plain that after the review of the facts. You're not answering my question. It's highly deferential. Why are we deferring to somebody who was making such big mistakes? The substantial evidence of review standard also constrains this Court's review. But the BIA upheld the credibility determination with regard to the number of contacts by Cienfuegos, correct? And there in the declaration I think it was several, and in the hearing it was twice. But he did not give her an opportunity to explain the distinction between several and twice. Isn't that an error on the part of both the IJ and the BIA? I believe the record does bear out that she was questioned about these inconsistencies. Was her declaration translated from Spanish? I don't know, Your Honor. It must have been. I do have the record. I can check. I mean, it seems to me that the notion that several means more than two is, you know, A, I think there are people who don't even know that, that several means more than two. And two, that I don't know what word is used in Spanish, but it's an awfully thin read, the difference between. I mean, generally it was more than one. Whether it was more than two is an awfully technical reason to find somebody, especially if it says different language involved, a pretty flimsy reason to find somebody not credible. Under the controlling statute, any inconsistency. All right. If it's an inconsistency. But I can tell you if I went to many people in this country and said, you know, if something happened several times and they said, whoops, it was only two, they wouldn't think that was a contradiction. Certainly. If the court doesn't like certain ones, certain pieces. All right. So now we have that one and we have the ribs. So which one should we rely on? The aunt failing to mention in her statement any discussion of Mr. Cienfuegos. This was allegedly the reason. The aunt wasn't there. I mean, her aunt wasn't here, right? This encounter with Mr. Cienfuegos was at some point in her testimony and statement the reason she decided that was her. But the aunt was here in the United States. Certainly. The aunt could have perhaps rehabilitated her testimony, but she didn't do so. So that goes to both credibility and corroboration. Did the aunt testify or the aunt wrote a letter? I'm sorry? Did the aunt testify? She did not. No. It was a letter. So we don't know why she didn't do it. We don't know if she didn't know or she didn't think anything of it or if she thought it was just some guy being obnoxious. Who knows? She also provided inconsistent statements regarding the number of times she was targeted outside of her nursing school. She provided conflicting information regarding the telephone calls, who was asked for, what happened when different people answered the phone. In general, the sequence of events. Was she targeted first at the nursing school? Wait, but that relies on the doctor's statement, right? Doctor's statement, declaration, and her testimony. I thought the difference in sequence was between her and the doctor. I believe that is one of the key ones, yes. So why does that make her not credible as opposed to the doctor? Again, all of these things add up. Did anybody ask her about that? Did anybody say the doctor says it happened the other way? I believe so. My worry about these is that, you know, when I first came to this court, I thought this would be kind of a simple thing for adverse credibility, but now looking at our case law, it's not quite the same. First of all, we have to have an inconsistency about something that's really inconsistent. We can't talk about years or we can't talk about time. And after we talk about what's inconsistent, not only do we have to talk about what's inconsistent, but then the person has to be confronted with the inconsistency. And then after being confronted with the inconsistency, then somebody's got to evaluate their explanation thereof. And if they have an explanation and they evaluate their explanation thereof, then at that point finally the BIA or the IJ can be sustained. When I went through most of these things that you have in front of us, I can't find that general, if you will, outline therein. So given that that's our case law, can I eliminate all those where she was not confronted? Eliminate them? I mean, it isn't something on which they can base the adverse credibility. All it takes is one. I understand. But then even if confronted, if she's not given a chance to explain or if the explanation they have of her explanation is frivolous, as my good colleague has suggested, then at that point, again, we can't have, that can't be an adverse credibility determinative event, can it? She was given the opportunity to explain. Do you agree with me, the outline?  So if, in fact, I go through the outline, I can't find those, then I really can't suggest that any of those are the appropriate measure of credibility, right? Yes. Okay. So then I go to the alternative approach. So talk to me about the nexus here. Well, as your Honor was saying to my opponent, how do we distinguish the Tino here? Yeah. And it simply can't be. Victims of general crime do not qualify for asylum. The Attorney General recently reaffirmed that in a matter of AB. Obviously, this Court sees this claim a lot. Well, it depends what that means. I mean, as I understand it, if the person is being, if there's general crime going on, but this person is being targeted by the criminals for some protected ground, they can still get asylum, right? If the alien can establish, yes, the nexus. Right. Even if there's all kinds of violent crime going on in general, but they happen to like particularly to attack, you know, black people. So it's no more useful from your end than it is from your opponent's end. It's still the question is, what about this case? Right. Ultimately, it's the alien's burden of proof to provide that evidence. As Judge Castell was pointing out, it's about what this record shows. And while there might be generalized violence, and while she might have endured some unfortunate incidents, the details of which are somewhat hazy, ultimately she bears the burden of proving a nexus between those incidents and her membership in a particular social group. And if I find a nexus, what about the inability or unwillingness to control the MS-13? Exactly, Your Honor. The immigration judge and the board both discussed that, that El Salvador is indeed making efforts to attempt to contain this violence. That's something that the Court has held as well. I mean, that just seems – I haven't looked carefully at the record on this question because I think there are other problems, but the notion that it's not just unwilling, it's unable. And we know how – the whole point of the widespread violence is that the police don't seem to be able to do anything about it. I apologize for citing a case that I have not cited to the Court previously, and I unfortunately don't have the actual cite with me. It's a very recent case, a matter of A.B. The Attorney General expressed – Well, I know what he said, and it makes no sense to me, if you want to know the truth. Ultimately, it's unable or unwilling. Exactly, unable or unwilling. Therefore, if they're unable, meaning it doesn't work, then it doesn't matter whether they're unwilling. And what he said to the contrary doesn't make any sense to me. Again, as Judge Kestel pointed out, it's what this record shows. Correct. But if we look at this record, Lopez says her hometown police often cited with the MS-13. She says they ignored the gang-related violence reports by women. She says she feared retaliation if she reported to them. That seems to be quite a bit of evidence that would suggest that one can't say that there's an ability and a willingness to control. Then if I look, she calls her brother, and the brother doesn't say, well, go down and see the police, and there's a policeman. The brother says, well, change your telephone. That's the only way to deal with it. There's another willingness, it seems to me, more evidence that there's no ability or willingness to control. How do I deal with that in the record? That, unfortunately, ties back to her credibility in terms of her own experiences as to what happened, whether or not those events are taken at their face value. If that's the assumption. For example, another weird thing about this credibility finding is the BIA says that she didn't provide a statement from Ms. Caceres, who could have corroborated the beating, and probably this statement as well. And she said, but actually what she said was, oh, I didn't know I needed that. I can get it if you want. So to get her, so if there's a problem there, then they should have let her get what she said she could get. She did think to provide a statement from her aunt. Why she didn't think to provide a statement. Because her aunt was here. Ms. Caceres is not here. She did not dispute that she still had contact with Ms. Caceres. Well, that's right. And she said, if you want me to get a letter, I'll get a letter. And then the BIA says that she didn't sufficiently explain the absence of a letter. Well, she did explain it. She said, you want me to get it, I'll get it. Again, the alien bears the burden of proof. She had the opportunity to present the best case. But what I'm saying is the analysis here at every turn has a problem. Not necessarily on the nexus question, but on the credibility question. This is a strong adverse credibility finding. Again, the questions about whether or not she had several or a few or two encounters with Boris, there was still an underlying inconsistency there as to whether or not he was in his car. He was in his car the first time. Was he in his car the second time? And that matters. Was he stalking her? Was he following her in his car? Or was he simply walking down the street? To be honest, I don't understand why the BIA proceeded the way it did. I mean, whether he was in his car stalking her or not, I don't know what it has to do with persecution. So why didn't they just say that? Why did they go through all this thing? I mean, he was a bad guy and he was looking at a good-looking woman and being obnoxious. That's basically what you can get out of it. That's precisely the point, Your Honor. Was it that? Was it a male being a chauvinistic pig? Or was it a male engaging in stalking, which is a crime? The judge seemed to think that it would have qualified as stalking under U.S. law. Right. If she presented consistent evidence to establish that. But even if it qualifies as stalking, does it qualify as ‑‑ I just thought this was a crazy way to go. They made things so difficult when it could have been so easy. I don't get it. Besides not knowing exactly what you guys from Washington and San Francisco are talking about when you say aunt, because we don't say that. I don't say it either. I was just repeating him. Certainly not in New York. Address the cat claim. With respect to Pat? Yes. Because it seems to me that even if we were to give you something on the other claims, you've got a bad problem with the cat claim, given how they gave the burden to the petitioner. Regarding relocation? Yes. The regulation that the board cited, the regulation puts the burden on her to establish that she can't relocate. Well, except this court had previously held, even before Maldonado, that there's no burden on the petitioner to show it's impossible to relocate. I thought your argument was that the IJ cited all the factors and looked at the evidence in the record and didn't base it solely on absence of evidence of an ability to relocate. I don't recall the possibility standard being applied here. And, yes, it was based on the totality of the record in this case. Okay. Attendant. I'm sorry. Go ahead. Your time is up. My colleagues have questions. If I may, there were two points that were raised in the affirmative argument that this court lacks jurisdiction to address. First was whether or not the board expressly adopted the immigration judge's decision. Second, there is no mixed motive analysis in petitioner's brief, so that affects how this court treats this case. Ultimately, this is a strong adverse credibility finding where the immigration judge, indeed, gave the alien substantial opportunities to explain her numerous inconsistencies, and she failed to do so. Okay. Thank you very much. Thank you, Your Honor. We have one minute. Go ahead. With respect to corroboration, Your Honor, we don't know to what extent the board relied on the lack of corroboration, and, therefore, if the court finds that there's a flawed adverse credibility finding, the record needs to be remanded so that the Wren procedural requirements can apply, so that Ms. Lopez actually gets an opportunity to provide that corroboration that she never got an opportunity to. With respect to the MS-13 gang leader, I'd just like to, with respect to what happened there, the MS-13, the Cienfuegos, Ms. Lopez testified as a known murderer in the community. When she left her house, he followed her meters away from her. This was happening at the same time she was receiving, around the same time that she was receiving calls. These calls were- She described him as well-mannered and polite, didn't she? That was the manner that he was speaking to her. Yes, Your Honor, and that's what terrified her. She knew exactly who he was and the power that he had, and that he was the leader of the MS-13 in that area. At the same time, she's receiving calls that echo what's happening. These calls are, we know you're there, we know when you leave, we know when you come home. When she walks out of her house, the MS-13 leader is there in his car saying, you know what, I can offer you protection if you need it. Well, actually I thought the sequence was the other way. The sequence was the other way, Your Honor. First there were the calls and the- No, I thought it was the other way. I thought first he was- Yes, Your Honor. First he was in the car, and then there were the calls. Yes, that's correct, Your Honor. And again, that's why this is all terrifying, because these things are happening in quick succession. Again- Okay, thank you very much. Thank you. Thank you both for your arguments in Lopez and Valiente v. Sessions. We'll go on to United States v. Chernyavsky. And we'll take a short break after the next case.
judges: Berzon, N.R. Smith, Castel